GRIFFIS, J.,
 

 for the Court:
 

 ¶ 1. This is an appeal of a' chancellor’s denial of a request for declaratory judgment. At issue is the validity of a lease extension for a parking lot located on Pas-cagoula Street in downtown Jackson, Mississippi. The plaintiff, Sam Kazery (Sam), appeals. We find no reversible error and affirm.
 

 FACTS
 

 ¶2. On August 1, 1966, Mary Kazery Eyd (Mary) (the Lessor) entered a lease agreement with Courtesy Inns, Inc. (the Lessee). In the lease, the Lessor granted the Lessee “full and unrestricted use of the leased premises for the term of this lease, including any extensions thereof. ... ” The lease required the “net rentals to be paid by Lessee to Lessor,” in a monthly amount that escalated as the term was extended. The Lessee was obligated to pay ad valorem taxes and provide adequate liability insurance.
 

 ¶ 3. The initial term of the lease was for one year, with five renewal options:
 

 FIRST OPTION: To be exercised on or before July 31, 1967, to extend the term for a period of twenty years....
 

 SECOND OPTION: To be exercised on or before March 31, 1987, to extend the term for a period of ten years....
 

 THIRD OPTION: To be exercised on or before March 31, 1997, to extend the term for a period of ten years beginning August 1, 1997, and ending July 31, 2007.
 

 FOURTH OPTION: To be exercised on or before March 31, 2007, to extend the term for a period of ten years beginning August 1, 2007, and ending July 31, 2017.
 

 FIFTH OPTION: To be exercised on or before March 31, 2017, to extend the term for a period of ten years beginning August 1, 2017, and ending July 31, 2027.
 

 ¶ 4. In 1967, the first option was exercised, and the lease term was extended through 1987. In 1985, Courtesy Inns assigned its interest to George Wilkinson. Thereafter, for over twenty years, Wilkinson made the monthly rental payments, paid the ad valorem taxes, and provided adequate liability-insurance coverage.
 

 ¶ 5. Mary’s interest in the property was transferred during this term. In 1986, Howard Ross was appointed by the Hinds County Chancery Court as the conservator for Mary. In an order, the chancellor authorized the conservator to convey the property to Mary’s son, Arnold Kazery (Arnold) or his designees. On November 10, 1986, Ross and Mary executed a warranty deed that conveyed the property to Arnold’s designees, his sons George Kaz-ery (George) and Sam. In 1987, George conveyed his interest to Sam. This deed was recorded in the land records in September 1990.
 

 ¶ 6. From 1987 through April 2007, Sam was the sole owner of the property. As such, he was the Lessor. Despite Sam’s actual ownership of the property and interest as Lessor, Wilkinson paid the monthly rental payment to Sam’s father, Arnold. Wilkinson also provided proof of insurance to Arnold, and Arnold was the named insured on the required insurance coverage. Wilkinson’s dealings with Sam were primarily about the payment of the ad valo-rem taxes.
 

 ¶ 7. At trial, Wilkinson explained his understanding of this arrangement. When the conservator was directed to convey Mary’s interest to Arnold or his designees,
 
 *1272
 
 Arnold had a substantial tax lien filed against him. Since Mary wanted Arnold to have the property, it was arranged so that the property would be titled in Sam’s name, but Arnold would receive the rent. Wilkinson claimed that, because of this arrangement, he believed that Arnold was the owner of the property and the Lessor under the lease. Wilkinson also claimed that, in addition to rent and insurance, he understood that he had to provide the renewal notices to Arnold as well.
 

 ¶ 8. Sam claimed that Wilkinson either knew or should have known that Sam, not Arnold, was the owner of the property and the Lessor under the lease. In support, Sam offered three letters he had sent to Wilkinson that could have revealed his interest in the property. First, by letter dated January 15, 1987, Sam sent Wilkinson a letter that advised “[t]he above mentioned taxes are due by February 1, 1987. Your prompt remittance is appreciated. Please forward to: Sam Kazery....” Second, by letter dated January 4, 1990, Sam sent Wilkinson a letter that enclosed the 1989 tax statement, which listed the property in the name of “Eyd, Mary K, c/o Sam Kazery.” Third, by letter dated November 23, 1992, Sam wrote to Wilkinson as follows:
 

 Attached herewith is a past due statement of taxes owed ... on the property which you lease from me on East Pasca-goula Street. As per our lease, you are obligated to pay these taxes. Hence, you are currently in contractual violation of our lease....
 

 Since you are already in material [breach] of said contract, I do hereby request the following forthwith:
 

 (1) Copies of proof of insurance on the property.
 

 (2) Receipts and proof of payment on property taxes.
 

 (3) Corporate papers for Courtesy Inn, Inc. and documents which specify transferral of lease to you personally-
 

 Failure to supply this required information ... will force me to commence proceedings to redeem said property and render your lease null and void. No longer can I brook [sic] the stress which your neglect incurs; this ongoing problem must cease. You will be responsible for any damages as a result of your neglect.
 

 In addition, Sam introduced as evidence the Hinds County tax receipt for tax year 1991 that indicated he was the owner of the property.
 

 ¶ 9. Despite these letters, Wilkinson continued to make the monthly rental payments to Arnold, and Arnold continued to be the named insured on the insurance policy. Sam offered no evidence of his objection or that this was improper.
 

 ¶ 10. The second option had to be renewed before March 31, 1987. The parties disputed how the second option was exercised. Wilkinson testified that he gave Arnold notice, which Arnold denied. Nevertheless, there was little dispute that the lease continued through 1997. Indeed, Wilkinson paid rent, paid the ad valorem taxes, and provided insurance coverage during this period of time.
 

 ¶ 11. The third option had to be renewed before March 31, 1997. Wilkinson sent notice of renewal to both Sam and Arnold. Thus, there was no dispute that the lease was extended through 2007. However, Wilkinson testified that he sent a letter to Sam, sometime in 1996 or 1997, which reads as follows:
 

 Enclosed is a copy of the letter I sent to you twice via certified mail and you refused. A copy was received by your father, but I thought you might like to have one also. This renews my lease for another 10 years starting in August of this year.
 

 
 *1273
 
 The letter was introduced into evidence. Wilkinson testified that he sent it to “let [Sam] know that I ... [had] renewed with his father.”
 

 ¶ 12. The fourth option had to be renewed before March 81, 2007. Wilkinson claimed that he exercised this option in two letters sent to Arnold. Arnold testified that he put Wilkinson’s correspondence in the garbage.
 

 ¶ 13. First, by letter dated June 24, 2004, Wilkinson wrote to Arnold as follows:
 

 Please be advised that I am renewing early my option to lease your lot on Pascagoula Street. This extends the lease through July 31, 2017.
 

 My rent checks will continue to be sent by the bank to your account as we agreed.
 

 ... I am glad you are pleased with the way everything is being handled. I called my insurance company and asked that they send to you proof of insurance. If you don’t have this with in several days please call me.
 

 Second, by letter dated March 2, 2006, Wilkinson wrote to Arnold as follows:
 

 The lease on the Mary Eyd[] Kazery property on Pascagoula Street has options that extend it through July 2027. I have already exercised the option that carries our agreement through July 2017 (letter dated 6/24/04). This letter reconfirms that renewal. Also enclosed is a copy of our insurance policy naming you as being [the] insured. I trust all is well with you and your family....
 

 Sam was not copied on either letter. Sam testified that Arnold never told him about either letter. Arnold continued to receive the monthly rental payments and be the named insured on the liability-insurance policy.
 

 ¶ 14. Sometime in early 2007, Sam was contacted by a developer who inquired about the possibility of purchasing the property.
 

 ¶ 15. On April 20, 2007, twenty days after the option deadline, Sam sent Wilkinson a letter, with a copy to Arnold, which reads:
 

 Please forward all future rent payments directly to Mr. Sam Kazery.... Cancel your automatic electronic draft to Mr. Arnold Kazery’s account immediately. If another payment is sent to him I will consider it as a nonpayment of rent. Further, as per your lease, send me proof of liability insurance protecting my interest in this specific property, for the last 10 years. I would like the actual insurance policy for each and every year. After reviewing said coverage I will take under advisement what is considered reasonable coverage for this new age.
 

 [[Image here]]
 

 As you well know there’s an interested buyer and I am not so sure I want to sell at all. I may even fight Eminent Domain to keep the property. And of course as I told you before, I am concerned about my children. If you desire to keep the lease would you like to join in with me and hire joint counsel?
 

 Please be aware that my estranged father does not represent me. And any communications with him of said property is for not. However, if you have a personal relationship with him and wish to chat then that is your business. However the property you rent from me, Sam Kazery, is strictly my business.
 

 ¶ 16. On May 1, 2007, Wilkinson sent Sam a letter, with a copy to Arnold, which reads as follows:
 

 Your letter dated April 20, 2007 has been received. I have verified with the tax assessor that Arnold Kazery’s interest was transferred to you. The May rent check is enclosed with this letter. I have called my insurance carrier ... and they have added you as an addition
 
 *1274
 
 al insured to the $1,000,000 liability policy....
 

 I would not like at this time to join with you in hiring joint counsel.
 

 ¶ 17. On July 12, Sam sent Wilkinson a letter that reads:
 

 I note that you have not exercised your option to renew in the above referenced lease and therefore the lease will expire by its terms and ending July 31, 2007. The purpose of this letter is to inform you that I would be interested in discussing with you a continuation of your occupancy of the premises on a month to month basis provided that we can reach a satisfactory arrangement. Please contact me at your earliest convenience if you decide to discuss such an arrangement. If you do not wish to do so then I will expect you to vacate the premises at the end of the above referenced term....
 

 ¶ 18. By letter dated July 23, 2007, Wilkinson’s attorney responded to Sam and informed him that the option had been exercised by the 2004 and 2006 letters to Arnold. Sam did not respond to this letter. In the ensuing months, Wilkinson continued to occupy the property, pay rent (albeit to Sam), provide insurance coverage with Sam listed as the named insured, and otherwise comply with the terms of the lease.
 

 ¶ 19. In February 2008, Sam filed a pro se complaint in the Chancery Court of Hinds County. The complaint asked the chancellor to find that Wilkinson had failed to give proper notice of renewal and declare the lease void. Wilkinson filed an answer and counterclaim. The counterclaim asked the chancery court to declare that the options to renew were exercised timely and in good faith and that the lease is in full force until July 31, 2027.
 

 ¶ 20. After two days of trial, the chancellor entered an order and opinion that denied Sam’s claim for declaratory judgment, denied the requests for attorneys’ fees, and “deemed all other issues moot.” The chancellor did not grant the relief requested in Wilkinson’s counterclaim. Sam timely filed a notice of appeal from this judgment. Wilkinson did not file a cross-appeal.
 

 STANDARD OF REVIEW
 

 ¶ 21. This Court will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.
 
 Sanderson v. Sanderson,
 
 824 So.2d 623, 625-26 (¶ 8) (Miss.2002). Legal questions are reviewed de novo.
 
 Russell v. Performance Toyota, Inc.,
 
 826 So.2d 719, 721 (¶ 5) (Miss.2002).
 

 ANALYSIS
 

 ¶ 22. The chancellor identified the issue as whether “Wilkinson had knowledge, actual, constructive, or otherwise that Sam Kazery had become the true title owner of the subject property and thus should have given Kazery notice that he intended to exercise in future options.” The chancellor then found:
 

 Kazery has brought forth no adequate evidence that he gave notice or that Wilkinson received knowledge of his September 1990 recorded deed. Regardless, with or without notice, Sam Kazery allowed Wilkinson’s notice to his father, Arnold Kazery to renew Wilkinson’s second and third renewal options which extended Wilkinson’s leasehold interest until July 31, 2007.
 

 ¶ 23. The chancellor then recognized the relationship between Sam, as the Lessor; Arnold, Sam’s father, who received the consideration for the lease (i.e. the monthly rental payments); and Wilkinson, as the Lessee, who had communications
 
 *1275
 
 with both Sam and Arnold. Indeed, the chancellor acknowledged that Wilkinson paid rent for twenty years to Arnold, who both Sam and Arnold testified was never the owner of the property and, thus, was not legally entitled to the rental payments. The chancellor further acknowledges that, for many years, Sam asked Wilkinson to provide proof of insurance coverage; Wilkinson complied, and Sam did not complain about this arrangement. Thus, for twenty years, Arnold received the economic benefit of the lease and the insurance protection, not Sam. It was not until 2007 that Sam demanded that Wilkinson pay rent to Sam as the true owner of the property and place his name on the liability-insurance policy.
 

 ¶ 24. The chancellor’s opinion discerned that Sam was responsible for some if not all of Wilkinson’s confusion, which could have been avoided if Sam had immediately, in 1990, informed Wilkinson of his ownership interest and directed the rent be paid to him and the insurance policy cover him. The chancellor likewise considered the evidence that Wilkinson could or should have known that Sam was the owner of the property. As a result, the chancellor called upon the equitable powers of the chancery court to make this decision.
 

 ¶ 25. The question for this Court to consider on appeal is whether the chancellor committed reversible error when she determined that Wilkinson’s notices of the exercise of the fourth and fifth options were sufficient to extend the lease when such notices were delivered timely to Arnold.
 

 ¶ 26. Sam’s first argument relates to the waiver of the lease-notice provisions prior to March 31, 2007. The chancellor ruled that Sam “waived and surrendered his rights to object to the [second] 1987 renewal option notice.” For the 1987 renewal, the chancellor determined that Sam never notified Wilkinson of his ownership interest. The chancellor also ruled that Sam waived his right to object to the 1997 renewal-option notice for “different circumstances.” For the 1997 renewal, the chancellor recognized that Wilkinson could have been aware of Sam’s ownership interest since Sam’s name was listed as the property owner on the tax notice that Wilkinson had the obligation to pay each year. The chancellor determined that “even though Wilkinson provided Arnold Kazery notice of the third [1997] renewal and not Sam Kazery, Sam Kazery acquiesced and allowed Wilkinson to continue as lessee.”
 

 ¶ 27. Sam argues that the waiver of the second (1987) option and the third (1997) option does not constitute a waiver of his right to receive written notification for the fourth and fifth options. Indeed, this is correct. The chancellor cited
 
 Taranto Amusement Co. v. Mitchell Associates, Inc.,
 
 820 So.2d 726, 729-30 (¶ 13) (Miss.Ct.App.2002) for the legal proposition that waiver requires “full knowledge of a right existing, and an intentional surrender and relinquishment of that right.” In
 
 Taranto Amusement Co.,
 
 this Court ruled:
 

 Under Mississippi case law, a “waiver” presupposes a full knowledge of a right existing, and an intentional surrender or relinquishment of that right. It contemplates something done designedly or knowingly, which modifies or changes existing rights, or varies or changes the terms and conditions of a contract. It is the voluntary surrender of a right. To establish a waiver, there must be shown an act or omission on the part of the one charged with the waiver fairly evidencing an intention permanently to surrender the right alleged to have been waived.
 

 Id.
 
 The Court held that, in a lease with successive options to renew, when the lessor failed to object to an improper renewal
 
 *1276
 
 for one option, he did not per se waive his right to insist on proper renewal for subsequent options. In other words, waiver with respect to one option is not a waiver with respect to all. “The reasoning behind demanding exact compliance with the terms of the [renewal] option including the notice provisions is that the Lessor is bound to grant the additional term while the Lessee is free to accept or reject it.”
 
 Id.
 
 at 729 (¶ 11) (citation omitted).
 

 ¶ 28. Here, the chancellor correctly applied this rule. The chancellor determined that even though Sam might have waived his rights under the notice provision and acquiesced to improper renewals in 1987 and 1997, which was contested by the parties, this fact would not operate as a waiver of his right to receive proper renewal notice in 2007 for the fourth or fifth option. The chancellor correctly determined that, in order to rule in favor of Wilkinson, she had to find Sam waived his right to the 2007 notice.
 

 ¶ 29. The proper analysis of the notice provision begins with the language of the lease:
 

 Notice of election to exercise each option to extend the lease shall be made in writing and shall be given by United States mail, addressed to Lessor, her heirs, executors, or assignees, at Lessor’s address last known to Lessee, and posted not later than midnight of the dates set out above for expiration of the respective options.
 

 ¶ 30. Sam obtained sole ownership of the property in 1987 and was the sole record owner of title when the deed from his brother was recorded in 1990. Thus, in 1990, at the latest, Sam became “the Lessor” and was entitled to receive the notice of extension. Likewise, he was then entitled to receive the monthly rental payments and be covered by the liability-insurance policy.
 

 ¶31. Despite his legal status as “the Lessor,” Sam neither expressly informed Wilkinson of his ownership interest, the need to pay Sam rent, nor list Sam as the named insured on an insurance policy. Instead, for approximately twenty years, Wilkinson made rental payments to Sam’s father, Arnold, and Arnold was listed as the named insured on the insurance policy. The chancellor noticed that the parties’ course of dealing included Arnold as a fundamental and integral part of the lease arrangement and the parties’ business dealings. Ultimately, the chancellor’s ruling was based on her interpretation of parties’ correspondence about the renewal of the 2007 option.
 

 ¶ 32. To prove his notice of extension, Wilkinson presented the two letters he had sent to Arnold. The June 24, 2004 letter states: “[P]lease be advised that I am renewing my option to lease your lot on Pascagoula Street. This extends the lease through July 31, 2017. My checks will continue to be sent by the bank to your account as we agreed.” The second letter, dated March 2, 2006, states: “[T]he lease on the Mary Eyd[ ] Kazery property on Pascagoula [SJtreet has options that extend it through July 2027. I have already exercised the option that carries our agreement through July 2017 (letter dated 6/24/04). This letter reconfirms that renewal.”
 

 ¶ 33. After these letters, Wilkinson continued to submit the monthly payments to Arnold. Sam neither objected nor instructed Wilkinson otherwise.
 

 ¶ 34. On April 20, 2007, after the option deadline, Sam sent Wilkinson a letter. In this letter, Sam first demanded that Wilkinson cease paying rent to Arnold and begin paying rent to him. Likewise, this letter was the first time Sam demanded that Wilkinson list Sam as the named in
 
 *1277
 
 sured on the liability-insurance policy. However, the letter also states:
 

 As you well know there’s an interested buyer and I am not so sure I want to sell at all.
 
 I may even fight Eminent Domain to keep the property. And of course as I told you before, I am concerned about my children.
 
 If you desire to keep the lease would you like to join in with me and hire joint counsel?
 

 Please be aware that my estranged father does not represent me. And any communications with him of said property is for not. However, if you have a personal relationship with him and wish to chat then that is your business.
 
 However the property you rent from me, Sam Kazery, is strictly my business.
 

 (Emphasis added).
 

 ¶ 35. Wilkinson’s letter of May 1, 2007, responded to Sam and enclosed the May rental payment. This was the first rental payment ever made to Sam. It also indicated that Wilkinson did not want to hire joint counsel to sell his interest. Sam’s response, a letter dated July 12th, indicated that he believed Wilkinson did not renew the lease and asked that he either renegotiate the lease or vacate the property.
 

 ¶ 36. The chancellor determined that Sam had waived his right to notice. In fact, the chancellor determined that ‘Wilkinson had been giving improper notices for years which [Sam] substantially ignored until the prospect of having a lucrative real estate buyer was at hand.” The chancellor then ruled that he had waived his right to receive proper renewal notices in 2004 and 2006 when he asked Wilkinson to share in the cost of hiring joint counsel to consider the sale of their interests in the property.
 

 ¶ 37. We agree that under
 
 Taranto Amusement Co.,
 
 Sam did not waive his right to receive notification under the lease. However, Wilkinson clearly established that he properly and timely extended the fourth option by exercising it prior to March 31, 2007, when he sent notice to the person he believed to be the owner and the person he had made rental payments to for twenty years. Had Sam timely informed Wilkinson of his ownership interest and assignment of the lease as late as 1990, then he certainly would have been the proper and only person to receive the notice. He did not, so he cannot now complain. We find no other authority that would convince us that the chancellor erred in this decision.
 

 ¶ 38. The chancellor also cited
 
 Koch v. H & S Development Co.,
 
 249 Miss. 590, 622, 163 So.2d 710, 724 (Miss.1964), for the following legal proposition:
 

 [Wjhere an option to renew is expressly conditioned upon a request therefor or notice thereof, it is generally held, in the absence of equitable considerations, that such notice must be given, or the right of renewal cannot be enforced.... [Tjhere are two exceptions when the renewal clause of a lease need not be strictly complied with to prevent a forfeiture, namely, (I) Waiver ..., and (II) where the lessee is entitled to and can obtain relief from his failure to give the notice required by the renewal provisions, (1) where by reason of compelling circumstances the failure to give notice results not from lessee’s own ignorance or negligence, but (2) from accident, fraud, surprise, or mistake; (3) and the forfeiture will result in a real hardship to lessee, (4) but will do little or no harm to the lessor.
 

 (Citations omitted). The chancellor then ruled:
 

 This court is persuaded that such compelling circumstances require equitable considerations. Even though Wilkinson knew or should have known, from 1992 on, that Sam Kazery was the true owner of the subject property, if all rents were
 
 *1278
 
 paid to Arnold Kazery, insurance was held for Arnold Kazery’s benefit, and if correspondences were being sent to Arnold Kazery and Sam Kazery still had not objected to such things, this court deems it equitable to look closely at the circumstances to determine whether the 2004 and 2006 renewal notiee[s] should be deemed proper. We will begin with exception II. If Wilkinson had properly inspected the tax statement for the name change of the title owner to Sam Kazery in 1991, he would have determined that Sam Kazery was the true owner of the subject property. At most, however, Wilkinson’s oversight of such could be considered just that, an oversight, mistake or he could have simply done a cursory review of the tax statement and overlooked the change.
 

 ¶ 39. Here, after considering the record and the chancellor’s findings, we recognize that the chancellor determined that Wilkinson was entitled to an equitable exception to the requirement of strict compliance with the renewal clause because of “compelling circumstances.” As compelling circumstances, the chancellor determined that Wilkinson should have known that Sam was the Lessor. Nonetheless, the chancellor determined that for the twenty years Sam was the property owner and “the Lessor,” but Sam allowed Wilkinson to pay the rent to his father, Arnold.
 

 ¶40. The chancellor also determined that, in his first correspondence after the renewal deadline of March 31, 2007, Sam wrote to Wilkinson; but he did not mention Wilkinson’s failure to renew. Rather, Sam demanded that Wilkinson stop paying rent to Arnold and begin paying the rent to him and that he be listed as the insured on the property. Further, Sam stated: “If you desire to keep the lease, would you like to join in with me and hire joint counsel?” The chancellor found it significant that Sam spoke of Wilkinson “keep[ing] the lease,” which, if Sam was going to insist on proper renewal, would have expired by its own terms on July 31, 2007.
 

 ¶ 41. Further, the chancellor found that the invitation to hire joint counsel was significant, in that there would be no need to include Wilkinson in fighting eminent domain or negotiating with the prospective buyer unless Sam acknowledged the validity of Wilkinson’s continuing leasehold interest. The chancellor also found it important that Sam did not attempt to remove Wilkinson from the land after July 31st but continued to include Wilkinson in negotiations with the prospective buyer, receive the rental payments without returning each payment, and allow Wilkinson to pay the insurance and taxes on the property.
 

 ¶ 42. Although we may have i'eached a different result if we had been the chancellor, under our defei’ential standard of review, we find that: the chancellor’s ruling was supported,by substantial, credible evidence; she did not abuse her discretion; her decision was not manifestly wrong or clearly erroneous; and she did not apply an erroneous legal standard.
 

 ¶ 43. For these reasons, we find no reversible error and affirm the judgment of the chancery court.
 

 ¶ 44. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.